[No. B133572. Second Dist., Div. Four. May 7, 2002.]

HECTOR RIVAS et al., Plaintiffs and Appellants, v.
SAFETY-KLEEN CORPORATION et al., Defendants and Respondents.

HECTOR MONTIEL, Plaintiff and Appellant, v.
SAFETY-KLEEN CORPORATION et al., Defendants and Respondents.

## COUNSEL

Law Offices of Raphael Metzger, Raphael Metzger; Ron Archer; and Mark Julius for Plaintiffs and Appellants Hector and Macrina Rivas and Hector Montiel.

Arter & Hadden, Frederick J. Ufkes and William S. Davis for Defendant and Respondent Safety-Kleen Corporation.

Stream & Stream, Theodore K. Stream, David D. Werner; and Jamie E. Wrage for Defendant and Respondent Petro Source Refining Corporation.

Prindle, Decker & Amaro and James G. Murray for Defendant and Respondent Calsol, Inc.

Steptoe and Johnson, Lawrence P. Riff and W. Chelsea Chen for Defendants and Respondents Chevron U.S.A., Inc., and Union Oil Company of California.

Gordon & Rees, Roger M. Mansukhani and Brian Ledger for Defendant and Respondent Kern Oil and Refining Co.

## OPINION

**CURRY, J.**—The claims of appellants Hector Rivas, his wife, Macrina, and Hector Montiel against the manufacturers and suppliers of various allegedly toxic chemicals and compounds were dismissed on statute of limitations grounds. The trial court ruled that appellants had sufficient knowledge of injury and wrongdoing for purposes of accrual of the statute of limitations more than one year prior to the dates their complaints were filed, and that all their claims, including a claim for fraudulent concealment based on failure to warn of a product defect, were subject to the one-year statute of limitations for personal injury rather than the three-year statute of limitations for fraud. Appellants contend these rulings were error. They also present the issue of whether federal law governing release of hazardous substances preempts California's statute of limitations. We conclude that the trial court did not err in granting summary judgment and that California's statute of limitations is not preempted. We, therefore, affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Rivas and Montiel Complaints*

On April 3, 1998, appellant Rivas and his wife, Macrina, filed a complaint for negligence, strict liability (failure to warn, design defect, and manufacturing defect), fraudulent concealment, breach of warranty, battery, and loss of consortium. Rivas claimed to have suffered severe damage to his kidneys, leading to a kidney transplant, as a result of exposure to toxic chemicals during his employment with Lakenor Auto & Truck Salvage Company. The defendants were respondents Safety-Kleen Corporation, Chevron U.S.A., Inc., and Union Oil Company of California. Respondents Calsol, Inc., Petro Source Refining Corporation, and Kern Oil and Refining Co. were subsequently added in place of Doe defendants. The complaint acknowledged that Rivas was diagnosed with kidney disease in 1991, but, to justify tolling the statute of limitations, alleged that he was "ignorant of the toxic cause of his [disease] until March 23, 1998."

Appellant Montiel filed a complaint for strict product liability, negligence, and breach of express and implied warranties on April 29, 1997, and subsequently filed a first amended complaint that contained the same causes of action as the Rivas complaint. Factually, the Montiel complaint alleged that between January 1993 and January 1996, Montiel worked for Automotive Rebuild Exchange, Inc., and performed duties which included the continual use of cleaning solvents. The complaint contended that Montiel "became aware of the connection between his disease and his exposure to

the defective products within one year of filing [the] Complaint." The first amended complaint alleged that Montiel was diagnosed with kidney failure in January 1996, but that "it was not until July of 1996 that [his] physician causally related his kidney failure to his occupational exposure to solvents." The same parties were named defendants as in the Rivas complaint. As of the time of filing the complaint, Montiel was awaiting a transplant.[1]

*The Rivas Motion for Summary Judgment*

Respondents moved for summary judgment in the Rivas action on statute of limitations grounds. Certain facts were not disputed. Rivas worked for Lakenor from 1973 to 1991.[2] One of his daily tasks was to degrease automobile parts using a Safety-Kleen parts washer machine and Safety-Kleen 105 Solvent.

In March 1991, Rivas visited a physician, Dr. Arthur Howard, because he was not feeling well. Dr. Howard diagnosed Rivas with kidney failure and asked him about chemicals he used at work. Rivas told his doctor about his use of the Safety-Kleen solvent and provided a list of chemicals copied from the Safety-Kleen container. Dr. Howard told Rivas to stay away from the solvent. Rivas immediately complied. Rivas was referred to two kidney specialists who diagnosed him with renal disease, "etiology undetermined." Over the next several years, Rivas's kidney condition deteriorated as he sought various forms of treatment including two years of dialysis. In November 1995, he received a kidney transplant.

In March or April 1996, Macrina heard from her son that Rivas might be entitled to workers' compensation if his kidney problems had been caused by harmful solvents at work. She informed Rivas. In September, Rivas consulted a workers' compensation attorney to investigate the possibility that the solvent he used at Lakenor caused his kidney damage. Later that month, the attorney filed an application with the Workers' Compensation Appeals Board on Rivas's behalf in which Rivas sought recovery for injury to his kidneys as a result of "repetitive exposure to toxic fumes, gases and liquids."

In December 1996, Rivas went to see Dr. Jay Prakash, who had been hired by Lakenor's insurer. He provided Dr. Prakash with the same list of chemicals that he had taken from the Safety-Kleen container in 1991. The Rivases filed their complaint on April 3, 1998.

---

[1]Montiel received a kidney transplant in the summer of 1998.

[2]In what appears to be a typographical error, the statement of undisputed facts actually says from "1971 to 1993."

*Montiel Motion for Summary Judgment*

Respondents also sought summary judgment in the Montiel matter on statute of limitations grounds. They established without dispute that Montiel worked at Automotive Rebuild Exchange from approximately January 1993 to January 1996. His regular tasks included washing automotive parts using a machine and solvent supplied by Safety-Kleen. Montiel sought medical treatment at a hospital in Mexico in January 1996. The doctors there told him that he had kidney failure caused by the solvent he used at work. Shortly thereafter, Montiel began undergoing dialysis. In April 1996, Montiel retained an attorney to represent him in filing a workers' compensation claim. His claim form, filed April 26, 1996, indicated that he had incurred "internal injuries including but not limited to kidneys, head (headaches)." Montiel saw a physician in connection with his workers' compensation claim and told the physician that the doctors in Mexico had related his kidney problems to solvents used at work. Montiel's complaint was not filed until April 29, 1997.

*Trial Court's Ruling on Motions*

The trial court granted summary judgment on statute of limitations grounds on both the Rivas and Montiel complaints. The court ruled that all of the claims were governed by the one-year statute of limitations and found that each claimant filed his complaint "more than one year after his first actual or constructive suspicion that the solvents he used at work had caused the injuries claimed . . . and that such injuries were the result of someone's wrongdoing." These appeals followed.[3]

· DISCUSSION

I

■ California's statute of limitations for claims of personal injury is one year from the date of accrual. (Code Civ. Proc., § 340, subd. (3).) Under the common law, "an action accrues on the date of injury . . . ." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109 [245 Cal.Rptr. 658, 751 P.2d 923].) But that principle is modified by the discovery rule under which "the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause." (*Ibid.*, fn. omitted; accord, *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 389 [87 Cal.Rptr.2d 453, 981 P.2d 79] ["Under the statute of limitations, a plaintiff must bring a cause of action within the

---

[3]The Rivas and Montiel lawsuits were designated related cases by the trial court and for purposes of appeal.

limitations period applicable thereto after accrual of the cause of action. The general rule for defining the accrual of a cause of action sets the date as the time when the cause of action is complete with all of its elements. An exception is the discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action, until, that is, he at least suspects, or has reason to suspect, a factual basis for its elements."].[4])

In *Jolly*, the plaintiff, who had suffered from cancer, knew that her mother had taken the synthetic drug estrogen, diethylstilbestrol (DES) and, beginning in 1972, suspected it was a defective product. She delayed legal action because she did not know the identity of the manufacturer of the DES ingested by her mother. In 1980, the Supreme Court decided *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], holding that a claimant could state a claim against DES manufacturers based on market share and shift the burden to the defendant manufacturer to disprove its involvement. Jolly filed her complaint in 1981, and the trial court granted a defense motion for summary judgment based on the statute of limitations. The Court of Appeal reversed, relying on its earlier decision in *Kensinger v. Abbott Laboratories* (1985) 171 Cal.App.3d 376 [217 Cal.Rptr. 313], that a claimant having awareness of an injury and its cause, but no knowledge of facts indicating wrongdoing by a particular defendant, could not be expected to pursue a legal claim. (See *id.* at p. 384.)

The Supreme Court disagreed with the Court of Appeal and disapproved *Kensinger*. It rejected the notion that the statute should be tolled where the claimant suffers injury, is aware of its origin, and suspects wrongdoing, but lacks knowledge of specific facts establishing misconduct, such as " 'failure to test' " or " 'failure to warn.' " (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110.) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . [T]he limitations period begins once the plaintiff ' " 'has notice or information of circumstances to put a reasonable person *on inquiry* . . . .' " ' [Citations.] A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists,

---

[4]The Supreme Court also stated in *Norgart* that "the affirmative defense based on the statute of limitations should not be characterized by courts as either 'favored' or 'disfavored.' The two public policies [implicated by limitations] . . .—the one for repose and the other for disposition on the merits—are equally strong, the one being no less important or substantial than the other." (*Norgart v. Upjohn Co., supra,* 21 Cal.4th at p. 396.)

it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Id.* at pp. 1110-1111, fn. omitted.) The court made clear that the words "wrong" and "wrongdoing" were meant "in their lay understanding," not in their legal sense. (*Id.* at p. 1110, fn. 7.) It further stressed that "[a] plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." (*Id.* at p. 1109.)

The Supreme Court went on to explain why Jolly's claim was not revived by its decision in *Sindell*, which admittedly "bridged the causal gap between DES manufacturers as a group and [Jolly's] injury." (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1115.) "*Sindell* did not provide [Jolly] with the critical 'fact' that started the limitations period. Nor did it create a new tort with an independent starting date for purposes of the statute of limitations. Rather, *Sindell* demonstrated the legal significance of facts already known to plaintiff. The statute had started to run for [Jolly] well before *Sindell* was decided." (*Jolly,* at p. 1115.) "[A] change in the law, either by statute or by case law, does not revive claims otherwise barred by the statute of limitations." (*Id.* at p. 1116.) This rule "encourages people to bring suit to change a rule of law with which they disagree, fostering growth and preventing legal stagnation. . . . [¶] . . . [¶] . . . [Jolly] was in no worse a position than Judith Sindell, who ultimately prevailed in changing the law." (*Id.* at p. 1117.)

## II

With this in mind, we turn to the issues in the present case. Appellant Rivas contends that the trial court erred in ruling that his product liability claims were barred by the California statute of limitations.[5] As we have seen, Rivas was diagnosed with a malfunctioning kidney in 1991, provided his doctor with a list of chemicals he worked with, and was told to stay away from the Safety-Kleen solvent. He did not file a civil lawsuit until April 1998, although he had submitted a workers' compensation claim in September 1996 attributing his disease to exposure to toxic fumes, gases, and liquids at work.

To support his contention that the statute of limitations did not accrue in 1991 when his doctor diagnosed the kidney malfunction and told him not to work with the Safety-Kleen solvent or in 1996 when he filed the workers' compensation claim, appellant relies on a Court of Appeal decision which preceded *Jolly—Pereira v. Dow Chemical Co.* (1982) 129 Cal.App.3d 865 [181 Cal.Rptr. 364]. In that case, a worker spilled a dangerous chemical on

---

[5]Montiel does not raise this issue in his brief.

his pants, below his protective apron. He used a solvent to clean it off. The spill occurred in January 1974. Two weeks later, a small rash appeared on each of his legs. It disappeared without treatment. Two months later, his ankles began to swell and his doctors diagnosed a kidney malfunction. They discussed with the injured worker "the possible causal connection between [the spilled chemical] and a nephrotic[6] syndrome" (*id.* at p. 869) and " 'the likelihood of possible toxic effects from the chemicals as well as the probable immunologic aspects of his disease' " (*id.* at p. 870). The injured worker was advised to return to work and " 'avoid[] intimate contact with the chemicals for the moment . . . .' " (*Ibid.*) The disease continued to worsen, until by June 1974, it extended to the worker's waist. He filed a workers' compensation claim on July 16, 1975. As a result of that filing, he obtained access to his medical files which included a letter sent in January 1975 from his physician to his employer's insurance carrier saying that the cause of kidney disorder was " 'most likely toxic, having been caused by the [spilled chemical]' . . . ." (*Id.* at p. 870.) A complaint was filed against the manufacturer and distributor of the chemical on January 14, 1976. The Court of Appeal reversed summary judgment granted in favor of the defendants based on the running of the statute of limitations.

The court cited two earlier decisions, *G. D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218] and *Velasquez v. Fibreboard Paper Products Corp.* (1979) 97 Cal.App.3d 881 [159 Cal.Rptr. 113], which discussed accrual of the statute of limitations when the claimant suffers an injury that causes an underlying pathological effect without perceptible trauma. In *Velasquez,* where the claimant was diagnosed with asbestosis more than a year before filing his complaint but had manifested only a slightly elevated glucose level and some minor abnormality in his EKG, the court saw no reason why "the discovery rule should not be applied in the novel situation before us where the plaintiff learns of the occupationally related disease before knowingly suffering its severe effects." (*Velasquez,* at p. 887.) Applying the discovery rule, the court held: "A brief explanation of findings and prognosis by the examining physician is necessary before it can be asserted that the patient has 'discovered' a latent or progressive disorder which has not, in all those years of exposure, caused noticeable harm. Where the physical manifestations have not yet occurred, discovery must mean a reasonable knowledge that they are likely to occur." (*Id.* at p. 889.)

The *Pereira* court's reliance on these authorities indicates that it considered the primary issue before it to be one of delayed discovery of serious injury. Like the claimant in *Velasquez,* the worker in *Pereira* manifested relatively minor physical problems at the time of the diagnosis. He may not

---

[6]"Nephrotic" refers to the kidneys.

have known for some time that he was suffering from a severe and progressive disorder, which was likely to cause serious debility in the future.

In its analysis, however, the court discussed not only the lack of perceptible serious trauma after the initial spill, but also the fact that the "plaintiffs [the injured worker and his wife] did not see any medical records until November 1975"; "[n]o medical person told them that the kidney problem was caused by the spill"; and "[a] specialist . . . told [the worker] to return to work but to avoid intimate contact with the chemicals temporarily." (*Pereira v. Dow Chemical Co., supra,* 129 Cal.App.3d at p. 874.) The court stated that this record did not "justif[y] a conclusion, as a matter of law, that plaintiffs were or should have been aware that the kidney problem was only caused by the spill." (*Ibid.*) Because "the earliest indication in the record that a component of [the chemicals to which the worker was exposed] can be both nephrotoxic and cumulative in the effect was when Valley Memorial Hospital records were subpoenaed in connection with the application for workmen's compensation benefits in July 1975" the court believed "it was improper to conclude, as matter of law, that plaintiffs acted unreasonably or without due diligence in pursuit of their claims." (*Id.* at pp. 874-875.)

Rivas seeks to construct from this language a rule precluding accrual of the statute of limitations until the injured party has been explicitly informed by his doctors that a certain substance or product caused the medical disorder or has had an opportunity to personally review medical records specifying the cause of the disorder. To the extent *Pereira* supports Rivas's belief that accrual of the statute of limitations is delayed until the claimant has knowledge of specific facts establishing causation, it has been superseded by *Jolly.* As we have discussed, the Supreme Court specifically rejected the proposition that "the statutory clock did not begin to tick until the plaintiff knew or reasonably should have known of the facts constituting wrongful conduct, as well as the fact of her injury and its relation to [the product]," in favor of the rule that the statute of limitations begins to run when the claimant "suspects or should suspect" that his or her injury was "caused by [someone's] wrongdoing . . . ." (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110, fn. omitted.)

Here, Rivas was informed by his physicians in 1991 that he was suffering from a serious and debilitating condition. He was asked to provide a list of all the chemicals he came in contact with and told in no uncertain terms to keep away from the solvent he was using at work. This alone should have been sufficient to arouse a reasonable person's suspicion and lead to further investigation. However, even were we to deem the doctor's statements ambiguous as Rivas urges due to the fact that the kidney specialists to whom

he was referred said the etiology of his disease was "undetermined," the fact that he filed a workers' compensation claim in September 1996 based on exposure to toxic chemicals at work is definitive proof that he had a suspicion that "someone ha[d] done something wrong to [him]" long before his civil complaint was filed in April 1998. (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110.)

## III

■ Appellants contend that their separate causes of action for fraudulent concealment were subject to the three-year statute of limitations for fraud (Code Civ. Proc., § 338, subd. (d)) rather than the one-year statute of limitations for personal injury. The causes of action for "fraudulent concealment" alleged that respondents were under a legal duty to disclose the toxic nature of their product and the risk of exposure to their products by labeling, and that they failed to do so.

■ "In ruling upon the applicability of a statute of limitations, it has been recognized that courts will look to the nature of the rights sued upon rather than to the form of action or to the relief demanded. Neither the caption, form, nor prayer of the complaint will conclusively determine the nature of the liability from which the cause of action flows. Instead, the true nature of the action will be ascertained from the basic facts . . . ." (*H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling Corp.* (1979) 99 Cal.App.3d 711, 717 [160 Cal.Rptr. 411]; accord, *Iverson, Yoakum, Papiano & Hatch v. Berwald* (1999) 76 Cal.App.4th 990, 995 [90 Cal.Rptr.2d 665].)

■ The essence of appellants' claims is that they were injured by a defective product. Product liability may arise from a manufacturing defect, a defective design, or failure to warn. (6 Witkin, Summary of Cal. Law (2001 supp.) Torts, § 1247, pp. 474-475.) ■ Although appellants' complaints purport to assert separate and distinct causes of action for "failure to warn" and "fraudulent concealment," the essence of both claims is that respondents' products were defective "because they lacked warnings adequate to inform [appellants] of their toxic hazards and serious effects upon the human body, and because they lacked instructions for handling and use adequate to prevent exposures to [appellants] causing serious injury."

The one-year statute of limitations has been applied to an action for breach of contract or breach of warranty where the alleged breach led to personal injury in cases such as *Rubino v. Utah Canning Co.* (1954) 123 Cal.App.2d 18, 23 [266 P.2d 163] (holding that action against distributor of

canned food for breach of implied warranty of fitness was subject to the one-year limitation governing personal injury claims) and *Cardoso v. American Medical Systems, Inc.* (1986) 183 Cal.App.3d 994 [228 Cal.Rptr. 627] (where appellants' action was for personal injury caused by a malfunctioning medical implant, one-year statute of limitations applied to their cause of action for breach of warranty). In addition, in *Weinstock v. Eissler* (1964) 224 Cal.App.2d 212 [36 Cal.Rptr. 537], where the plaintiff claimed brain injury from a cerebral angiogram and a spinal tap and alleged that false statements were made about the safety of the angiogram, the court held: "The one-year statute of limitations is applicable even where, as here, the plaintiff-patient alleges a cause of action for deceit based on the physician's false representations or fraudulent concealment of the nature and extent of the injury." (*Id.* at p. 227.) Similarly, in *Aerojet General Corp. v. Superior Court* (1986) 177 Cal.App.3d 950 [223 Cal.Rptr. 249], the plaintiffs, husband and wife, alleged that the husband's employer concealed from the husband and the doctors trying to treat him that he was suffering from a disease caused by the ingestion and exposure to various chemicals. The court concluded that "the one-year statute of limitations provided by Code of Civil Procedure section 340, subdivision (3), provides the appropriate period of limitation." (*Aerojet General Corp.,* at p. 954, fn. 2.) More recently, in *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048 [100 Cal.Rptr.2d 223], where the plaintiff, a nurse, suffered a severe reaction to allegedly defective latex gloves and pled a cause of action for fraudulent concealment, the court noted: "Although [the plaintiff] argued at the summary judgment hearing at the trial court that a separate limitations period should apply to that claim (3 year, § 338), she has abandoned any such argument on appeal. That is appropriate since this is a personal injury suit to which the one-year statute clearly applies. (§ 340, subd. (3).)" (*Clark,* at p. 1054, fn. 2.) Thus, the weight of authority supports the trial court's decision to apply the one-year statute of limitations to all of appellants' claims.

Appellants point to the contrary decision in *Snow v. A. H. Robins Co.* (1985) 165 Cal.App.3d 120 [211 Cal.Rptr. 271]. The plaintiff there had become pregnant while using the Dalkon Shield birth control device. She alleged that defendants falsely represented that the device was a superior birth control device with the lowest failure rate of any other intrauterine device on the market. Her complaint further alleged that defendants knew that the failure rate was significantly higher than they represented. As can be seen from the facts, *A. H. Robins* was not a typical product liability case. The plaintiff did not suffer an unexpected injury as a side effect of using the product; her injury was sustained because the product did not work as it was intended. She was able to point to specific affirmative misrepresentations made by the manufacturer about the product's effectiveness, which induced

her to use the product. Here, in contrast, there is no issue about the effectiveness of the solvent. Appellants maintain that their injury was an unintended side effect and that respondents' fault lies in their failure to warn of the product's potential for toxicity. Thus, the fraud claim is merely the failure to warn claim recast as a claim for fraudulent concealment. In this situation, we see no reason to depart from the general rule applying the one-year statute of limitations to claims for product liability however they are denominated.

## IV

Appellants contend that California's statute of limitations is preempted by federal law, specifically section 9658 of title 42 United States Code (section 9658), part of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) added by the Superfund Amendments and Reauthorization Act of 1986 (SARA). Appellants maintain that under this provision the statute of limitations does not accrue until the claimant becomes aware of or identifies not just the injury-causing product, but the specific hazardous substance or chemical compound within the product which led to the injury.

Respondents counter with the arguments that (1) section 9658 does not apply to toxic exposure in the workplace and (2) even if it did, accrual of the statute of limitations is the same under CERCLA as under California law and is not tolled while the claimant seeks the precise scientific identity of the chemical compound that harmed him.

There is no dispute that if section 9658 applies to the situation and if accrual under California law occurs sooner than under its provisions, California law would be preempted. Section 9658 expressly provides: "In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute."[7]

The statute, by its terms, applies only where the harmful substances to which claimants were exposed were "released" into the "environment" from

---

[7]The federally required commencement date is the "date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." (§ 9658(b)(4)(A).)

a "facility." Section 9658 further states that "[t]he terms used in this section shall have the same meaning as when used in subchapter I of this chapter." (§ 9658(b)(1).) These terms are all the subject of statutory definitions found in section 9601 of title 42 United States Code (located in subch. I) and were part of CERCLA since its original enactment in 1980. (See Pub.L. No. 96-510, tit. I, § 101(8), (9) & (22) (Dec. 11, 1980) 94 Stat. 2767.) "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." (42 U.S.C. § 9601(22).)

"The term 'environment' means (A) the navigable waters, the waters of the contiguous zone, and the ocean water of which the natural resources are under the exclusive management authority of the United States . . . , and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." (42 U.S.C. § 9601(8).)

"The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." (42 U.S.C. § 9601(9).)

The statutory definition of "release" contains an express exclusion for "any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons . . . ." (42 U.S.C. § 9601(22)(A).) Both sides focus on this language in their briefs. Respondents stress the language in the first part of the exclusion and contend that since the alleged exposure occurred "solely within [the] workplace," no release occurred for purposes of CERCLA or section 9658. Appellants interpret the exclusion differently, believing that the phrase "with respect to a claim which such persons may assert against the employer of such persons" is evidence that "Congress considered whether occupational exposures constitute 'releases' within the meaning of CERCLA, and determined that they do, except as such might permit exposed workers to assert tort liability claims against their employers" and that "Congress determined that the occupational exposures do indeed constitute

'releases' for the purpose of asserting toxic tort claims against third party manufacturers . . . ."

We disagree with appellants' interpretation. Congress could not have had in mind the needs of workers asserting toxic tort claims against third party manufacturers in 1980 when the relevant definitional provisions of CERCLA were drafted. To appreciate why, one need only review briefly CERCLA's original purpose and effect. Congress enacted CERCLA to "initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." (H.R. No. 96-1016, 96th Cong., 2d Sess., pt. 1, p. 22 (1980), reprinted in 1980 U.S. Code Cong. & Admin. News, at pp. 6119, 6125; see also *3550 Stevens Creek Assoc. v. Barclays Bank* (9th Cir. 1990) 915 F.2d 1355, 1357, quoting Pub.L. No. 96-510, *supra*, 94 Stat. 2767 ["CERCLA was enacted to 'provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites.' "].) CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed. [Citations.] To promote these objectives, Congress created a private claim for certain 'response costs' against 'various types of persons who contributed to the dumping of hazardous waste at a site.' " (*3550 Stevens Creek Assoc.,* at p. 1357, quoting *Ascon Properties, Inc. v. Mobil Oil Co.* (9th Cir. 1989) 866 F.2d 1149, 1152.) The intent behind CERCLA was not "to make injured parties whole or to create a general vehicle for toxic tort actions." (*Ambrogi v. Gould, Inc.* (M.D.Pa. 1990) 750 F.Supp. 1233, 1238; accord, *Struhar v. City of Cleveland* (N.D. Ohio 1998) 7 F.Supp.2d 948, 951.)

To establish a claim for cost recovery under CERCLA, a claimant must prove not only that the site in question was a "facility" and that a "release" or threatened release of a hazardous substance occurred, but must also show that the defendant falls within a category of "liable parties" as set forth in title 42 United States Code section 9607(a) and that the release or threatened release caused the claimant to incur "necessary costs of response." (*ABB Industrial Systems v. Prime Technology, Inc.* (2d Cir. 1997) 120 F.3d 351, 356; *U.S. v. Poly-Carb, Inc.* (D.Nev. 1996) 951 F.Supp. 1518, 1522; see 42 U.S.C. § 9607(a)(4)(B).) The four categories of "liable parties" as outlined in title 42 United States Code section 9607(a) are: (1) present owners and operators of a facility; (2) past owners and operators of a facility at the time of disposal; (3) arrangers for disposal or treatment; and (4) transporters. (See *U.S. v. CDMG Realty Co.* (3d Cir. 1996) 96 F.3d 706, 713.) Noticeably absent from this list are manufacturers or distributors of products, the

entities most likely to end up as defendants in a product liability lawsuit where personal injury is involved.[8]

It is clear that CERCLA was and is primarily concerned with improper disposal and dumping of hazardous materials by end users and those with whom they contract. Entities that manufacture and distribute useful but potentially toxic products were not part of the problem Congress set out to solve in 1980 when CERCLA and the definitional provisions it contains were enacted. Nor was Congress concerned at that time with individual attempts to recover for personal injury. Since that is the case, appellants' contention that Congress intended by its choice of language in title 42 United States Code section 9601(22)(A) to give exposed workers an opportunity to "assert[] toxic tort claims against third party manufacturers" makes no sense. Congress could not have defined "release" with an eye toward permitting employees who suffer personal injury from occupational exposure to chemicals to pursue claims against manufacturers and distributors when those entities were not intended to play a part in the original CERCLA statutory scheme, and personal injury claims were not addressed in the original statute.

We are equally unsatisfied, however, with respondents' suggestion that the language in section 9601(22)(A) is clear evidence that Congress intended to exclude exposure in the workplace from the reach of CERCLA and section 9658. As discussed in *Covalt v. Carey Canada Inc.* (7th Cir. 1988) 860 F.2d 1434—the case on which respondents primarily rely—the language of the exclusion is ambiguous in several respects. The words "with respect to a claim which [a person exposed within a workplace] may assert against the employer of such persons" (§ 9601(22)(A)) may be intended as an oblique reference to workers' compensation law.[9] But since workers' compensation claims are not, strictly speaking, claims "against the employer," it could conceivably mean just the opposite and apply only where the employee has no workers' compensation option but brings a claim directly against the employer. Moreover, since the exclusion applies only if the exposed persons "may assert" a claim against their employer, there is some doubt about whether it would apply where any such claim would be unsuccessful. In

[8]Manufacturers and distributors of materials may occasionally find themselves subject to a CERCLA recovery action when it appears that their intent was to arrange for the disposal of a hazardous material under the guise of a product sale. (See, e.g., *Pneumo Abex v. High Point Thomasville & Denton* (4th Cir. 1998) 142 F.3d 769, 775; *U.S. v. Atlas Lederer Co.* (S.D. Ohio 2000) 85 F.Supp.2d 828, 831-832.)

[9]See *National R.R. Passenger Corp. v. NYC Housing Auth.* (S.D.N.Y. 1993) 819 F.Supp. 1271, 1278, where the court stated in dicta that the clause "excludes from CERCLA liability claims by employees for injuries caused by releases of hazardous substances within a workplace which are covered by worker's compensation."

*Covalt,* for example, the plaintiff was exposed to asbestos in his place of employment—Proko Industries—between 1963 and 1971, but did not become ill until 1986. By that time, he argued, he did not have a viable remedy against Proko because he could not collect any judgment entered against it. The court acknowledged the "possibility" that "the exception deals with kinds of claims—for example, workplace injuries to employees that ordinarily are covered by workers' compensation programs—without depending on the employee's ability to collect in the given case." (*Id.* at p. 1436.) The court did not "pursue this possibility" because it rejected plaintiff's contention on another ground, concluding that "[a] place where work is being carried out is not the 'environment' for purposes of [CERCLA]." (*Ibid.*)

· Analyzing the question of whether exposure to asbestos on the job constitutes a release into the "environment," the court stated: "It is lexically possible to treat the 'environment' as everything pertaining to the planet Earth, so that the instant a container of asbestos is opened it is released 'into [the local portion of] the environment'. Such a global treatment erases 'released into the environment' as a limitation, however, by ensuring that it is always satisfied. No substance, except perhaps an injected drug, harms anyone unless it was at least for an instant in an 'environment'. A reading of this sort trivializes statutory language. The text makes more sense if read to refer to more widespread releases that affect strangers: asbestos wafting out of Proko's plant and contaminating a nearby meadow, or shaken loose from insulation Proko installed in a school; asbestos left behind as a contaminant when Proko closes its plant; fluids leaching into the water supply from a plant, and so on. [¶] Doubtless some of the language in the United States Code is meaningless. No institution can fill 20 linear feet of shelving with tiny type and commit no redundancies. Yet it is hard to believe that 'released into the environment' is an empty phrase. The focus and structure of CERCLA itself show that it has force. Asbestos encountered at work is not a toxic waste, and the Superfund Act is about inactive hazardous waste sites." (*Covalt v. Carey Canada Inc., supra,* 860 F.2d at pp. 1436-1437.) Nor did the court believe the 1986 amendments changed the meaning of the term: "SARA, the source of the text under consideration, does not change the focus or structure of CERCLA. . . . Nothing in either the 1986 Amendments or their legislative history hints that EPA [the agency empowered to investigate sites it believes are contaminated with hazardous waste and establish a Superfund for cleaning them up] is to muscle in on the territory of the Department of Labor, which administers programs dealing with workplace safety." (*Id.* at p. 1437.)

The court in *Covalt* was heavily influenced by the study conducted under the authority of title 42 United States Code section 9651(e), which investigated the adequacy of existing common law and statutory remedies in

providing legal redress for injury caused by the release of hazardous substances and preceded the SARA amendments. The study had stated: " 'Instances when hazardous substances may be released in other than waste form—i.e., the application of pesticides regulated under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)—are expressly exempted from the enforcement provisions of the [Superfund] Act. Thus, the emphasis of this report, similar to the emphasis of CERCLA, is on remedying the adverse consequences of improper disposal, improper transportation, spills, and improperly maintained or closed disposal sites.' " (*Covalt v. Carey Canada Inc., supra,* 860 F.2d at p. 1438.)

Given this legislative history, the court in *Covalt* was not persuaded by the argument that "applying [section 9658] to substances encountered at work as part of ongoing operations would have deterrent and compensatory effects." (*Covalt v. Carey Canada Inc., supra,* 860 F.2d at p. 1439.) "Courts do not strive for 'more' of all legislative objectives . . . ; laws have both directions and limits, and each must be scrupulously honored. . . . Giving [section 9658] its broadest possible meaning not only preempts wide sweeps of state law—something we do not lightly attribute to Congress—but also thrusts CERCLA into the domain of other federal rules expressly dealing with employees' safety, another thing we do not lightly attribute to Congress." (*Covalt,* at p. 1439.)

We agree with the Seventh Circuit's analysis. Clearly, Congress intended section 9658 to have impact beyond actions for recovery of expenses incurred in cleaning up toxic waste sites. It applies by its terms to individual lawsuits for "personal injury, or property damages," not just "necessary costs of response," (*ibid.*) and can be invoked regardless of whether the defendants meet the statutory definition of "liable party" under title 42 United States Code section 9607(a). Equally obvious, however, is the fact that section 9658 was never meant to extend to all state court lawsuits for personal injury and property damage arising from exposure to toxic substances. By retaining the requirements that the exposure result from "release" into the "environment" from a "facility" as those terms are used for purposes of a CERCLA cost recovery action, Congress expressed its intent to limit the statute's scope.

We find further support for our position in the decisions of the other federal courts which have agreed with the Seventh Circuit that an exposure limited to a few persons inside an enclosed space is not covered by either section 9658 or CERCLA in general. In *Knox v. AC & S, Inc.* (S.D.Ind. 1988) 690 F.Supp. 752, the decedent was exposed to the defendants' asbestos-containing thermal insulation products during the course of his employment as an insulation mechanic. The issue was whether the state's statute of

repose, which put an upper limit on the time within which a lawsuit could be filed without regard to the date the injury was discovered, was pre-empted by section 9658. The court agreed with the plaintiff that "[t]he release of the asbestos fibers from the asbestos-containing insulation products at [the decedent's] work sites would seem capable of characterization as a CERCLA release, in that the fibers were 'emitted' or 'discharged' from the insulation." (*Knox*, at pp. 756-757.) But the court could not agree that it constituted a release into the "environment": "Although 'environment' is defined in terms of ambient air, an evaluation of the term environment in terms of the overall purpose and scope of CERCLA indicates that the case at bar is not properly considered within the purview of CERCLA and more specifically, the discovery statute of limitations established in § 9658." (*Knox*, at p. 757.)

*Knox* was followed in *Electric Power Bd. of Chattanooga v. Westinghouse* (E.D.Tenn. 1988) 716 F.Supp. 1069. As set forth in the statement of facts, an explosion occurred in a penthouse vault located atop a building in downtown Chattanooga. The vault was being utilized by the Electric Power Board of Chattanooga. The explosion occurred while a three-man maintenance crew was performing service work on equipment located in the vault. Two transformers in the vault were damaged by the explosion and discharged "toxic dielectric fluid containing PCB's." (*Id.* at p. 1072.) The manufacturers of those transformers were sued by the board for cost of repair and cleanup. A statute of limitations defense was raised based on the date the transformers were purchased and put into use, nearly 20 years prior to the explosion. The board "submitted evidence that PCB's were leaked or released into the penthouse vault and subsequently tracked about the general area by persons extinguishing the fire." (*Id.* at p. 1080.) The court, however, "d[id] not believe that the leaking of a relatively small quantity of dielectric fluid from a damaged transformer, within the confines of a penthouse containing electrical equipment, is the type of 'release into the environment contemplated or intended by the CERCLA.'" (*Id.* at p. 1081.)

The court in *Electric Power Bd.* was also persuaded of section 9658's inapplicability by another exclusion contained in one of the key definitional provisions. The definition of "facility" excludes "any consumer product in consumer use . . . ." (42 U.S.C. § 9601(9).) The court believed that "the . . . transformers containing . . . dielectric fluid are consumer products in consumer use. The transformers were not, therefore, 'facilities.'" (*Electric Power Bd. of Chattanooga v. Westinghouse, supra,* 716 F.Supp. at p. 1080.)

The Ninth Circuit Court of Appeals rejected *Electric Power Bd.*'s interpretation of "facility" in *3550 Stevens Creek Assoc. v. Barclays Bank, supra,*

915 F.2d 1355 and *People of State of Cal. v. Blech* (9th Cir. 1992) 976 F.2d 525 (*Blech*), where the issue was whether the costs incurred in the voluntary removal of asbestos could be recovered from a current or prior building owner. The district court in *Blech* had ruled that asbestos building material is a consumer product in consumer use. The Ninth Circuit expressed its disapproval: "[W]e recognized in *Stevens Creek* that 'the term "facility" has been broadly construed by the courts, such that "in order to show that an area is a 'facility,' the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there." ' [Citation.] The logical reading of the discussion in *Stevens Creek* is that we would have held an asbestos-containing *building* to be a facility had the issue been presented. To the extent there may be ambiguity in *Stevens Creek*, we now hold that structures containing asbestos building material as distinguished, for example, from containers of such materials for consumer use, satisfy the broad definition of 'facility' in CERCLA . . . ." (*Blech, supra,* 976 F.2d at p. 527, fn. 1.)[10]

The court agreed, however, with the interpretation of environment advocated by the Seventh Circuit in *Covalt*: "[T]here is no basis for inferring an intention by Congress to create a private cause of action under CERCLA for recovery of the cost of removing asbestos building materials from a structure when no release of hazardous substances outside the structure is alleged." (*Blech, supra,* 976 F.2d at p. 527; accord, *3550 Stevens Creek Assoc. v. Barclays Bank, supra,* 915 F.2d at p. 1360, fn. 9 ["Although not contested in this proceeding, courts which have addressed [the] language [defining environment] have determined that the escape of asbestos fibers within a building falls outside the intended objectives of CERCLA."]; *G.J. Leasing Co., Inc. v. Union Elec. Co.* (7th Cir. 1995) 54 F.3d 379, 385 ["[T]he release of asbestos inside a building, with no leak outside . . . is not governed by CERCLA."].)

In the cases which appellants cite in support of a contrary interpretation of release into the environment—*State of Vt. v. Staco, Inc.* (D.Vt. 1988) 684 F.Supp. 822 and *Kowalski v. Goodyear Tire and Rubber Co.* (W.D.N.Y 1994)

---

[10]Compare *CP Holdings v. Goldberg-Zoino & Associates* (D.N.H. 1991) 769 F.Supp. 432, 439, where the court read the "commercial products" exclusion to the definition of facility in a way which supports both the workplace exclusion and the restricted interpretation of environment: "The legislative history . . . indicates that the consumer products limitation was likely a result of fears that without such a limitation, businesses that routinely use hazardous substances in everyday operations could be held liable under CERCLA for injuries to workers or those exposed to the substances within the confines of the building. It is clear, then, that the limitation on the definition of 'facility' excluding 'consumer products in consumer use' was designed to limit CERCLA so as not to cover exposure or release of hazardous substances from a consumer product solely within a building." (Fn. omitted.)

841 F.Supp. 104—the workers carried substantial quantities of hazardous substances outside the workplace in the form of dust covering their clothing. Third parties were exposed to these hazardous substances, and the environment outside the workplace was significantly impacted. Appellants attempt to bring themselves within the purview of these decisions by contending in their briefs that some Safety-Kleen liquid or vapors clung to their skin or clothing and were inhaled or released into the ambient air outside their places of employment. No such allegations were contained in appellants' complaints or their oppositions to the summary judgment motions. Even had they been included, we do not believe that such de minimis exposure transforms these occupational exposure actions into CERCLA claims. The plaintiffs in *State of Vt.* presented evidence that the air in the workers' homes had elevated levels of mercury and that their septic tanks contained an amount of mercury which was capable of leaching into the water supply. (*State of Vt.*, 684 F.Supp. at p. 836, fn. 8.) The claim in *Kowalski* arose when the worker's wife allegedly developed cancer from handling his contaminated clothing and from the spread of the dangerous chemical throughout their home. (*Kowalski*, 841 F.Supp. at p. 105.) Accepting appellants' contention that a few drops of solvent on their clothing constitutes a release into the environment for purposes of CERCLA would result in the trivializing of the statutory language which the courts have sought to avoid by restricting the definition of the term.

Finally, *Tragarz v. Keene Corp.* (7th Cir. 1992) 980 F.2d 411, which appellants cite for the proposition that "an occupational exposure to asbestos causing the latent development of mesothelioma constituted a release into the environment" is inapposite because it involved the interpretation of an Illinois joint and several liability statute. The Illinois statute contained similar language to CERCLA—requiring a "discharge into the environment"—and defendants sought to rely on *Covalt*, arguing that "the reasoning in *Covalt* applies to the interpretation of the Illinois joint and several liability provision . . . ." (*Tragarz v. Keene Corp., supra*, at p. 427.) The court acknowledged that "in *Covalt* we held that release into the environment from a facility under SARA did not include releases into the internal workplace environment, at least where a worker is the injured party . . . because such a reading would trivialize this term." (*Tragarz*, at p. 427.) But the court believed that the case before it and the issues in *Covalt* were not "as similar as the defendants paint them." (*Tragarz*, at p. 427.) Although the "similar phraseology" in the Illinois statute "should not be interpreted in a manner that makes it devoid of meaning," it did not follow that the phraseology "ha[d] the same meaning under Illinois's joint and several liability statute and CERCLA" because they were "two very different statutes." (*Ibid.*) "CERCLA, a federal statute, focuses on the national concern of public health

and environment while Illinois's joint and several liability statute focuses on individual, personal injury and property claims. With this change in focus may come a change in the meaning of the term environment." (*Id.* at p. 428.)

Based on the weight of authority and the persuasiveness of the Seventh Circuit's analysis in *Covalt*, we hold that section 9658 does not apply in the present situation.[11]

## V

In a supplemental brief, appellants contend that determination of the date the statute of limitations accrued under California law must be reconsidered in light of the Supreme Court's 1999 decision in *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 [86 Cal.Rptr.2d 846, 980 P.2d 398], which, they assert, stands for the proposition that accrual does not occur under California law until the claimant identifies the particular hazardous substance that caused his injury. In *Bockrath*, the plaintiff contracted multiple myeloma while working at Hughes Aircraft Company from January 1973 to March 1994. His suit named approximately 55 defendants, including the manufacturers of such common items as WD-40 and rubber cement. The court was primarily concerned with "overbroad litigation." (*Id.* at p. 81.) According to the court: "The law cannot tolerate lawsuits by prospecting plaintiffs who sue multiple defendants on speculation that their products may have caused harm over time through exposure to toxins in them, and who thereafter try to learn through discovery whether their speculation was well-founded." (*Ibid.*) "[I]t is sharp practice to implead defendants in a products liability suit alleging long-term exposure to multiple toxins unless, after a reasonable inquiry, the plaintiff actually believes that evidence has been or is likely to be found raising a reasonable medical probability that each defendant's product was a substantial factor in causing the harm . . . ." (*Id.* at p. 82.) "A cancer-afflicted plaintiff suing every manufacturer of an airborne substance found in the Los Angeles basin probably would be exposed to sanctions for the suit, even if certain defendants eventually were found to have made a product that was a substantial factor in the onset of the plaintiff's cancer." (*Id.* at p. 83.)

---

[11]We do not, therefore, reach the question of whether the federal statute and the California discovery rule are divergent. (See *Angeles Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4th 112, 123 [51 Cal.Rptr.2d 594] ["Where a state does not apply the discovery rule to claims for property damage caused by toxic contamination, CERCLA mandates that the state statute of limitations begin to run when the plaintiff discovers, or should have discovered, the injury and its cause. [Citations.] In contrast, where a state applies the discovery rule, such that the statute of limitations commences on the same date under both state law and CERCLA, there is no federal preemption."].)

The plaintiff's complaint, which was "poorly drafted" and "internally inconsistent," appeared to be "attempting to allege" that "defendants' products cause cancer, he was exposed to them, and they migrated to his internal organs and caused his multiple myeloma." (*Bockrath v. Aldrich Chemical Co., supra,* 21 Cal.4th at p. 79.) The court concluded the allegations were "insufficient" because they did not allege "that each defendant's product was a substantial factor . . . in causing his multiple myeloma." (*Id.* at pp. 79-80.) Due to the multitude of defendants named and products identified, the pleaded facts did not show plainly the connection between cause and effect or give rise to an inference of causation that was more than theoretical. The court remanded in order to give the plaintiff the opportunity to assert the following specific allegations: "(1) Plaintiff must allege that he was exposed to each of the toxic materials claimed to have caused a specific illness. An allegation that he was exposed to 'most and perhaps all' of the substances listed is inadequate. [¶] (2) He must identify each product that allegedly caused the injury. It is insufficient to allege that the toxins in defendants' products caused it. [¶] (3) He must allege that as a result of the exposure, the toxins entered his body. [¶] (4) He must allege that he suffers from a specific illness, and that each toxin that entered his body was a substantial factor in bringing about, prolonging, or aggravating that illness. [¶] (5) Finally, . . . he must allege that each toxin he absorbed was manufactured or supplied by a named defendant." (*Id.* at p. 80, fn. omitted.)

Because the court in *Bockrath* was primarily concerned with plaintiffs who lack any real notion of the identity of the product which was a substantial factor in causing their injury, the discussion appears to be of limited applicability to a situation such as the present one where the plaintiffs have focused their suspicions on a single product and a handful of manufacturers. Appellants contend that it stands for the proposition that "one of the necessary elements of a cause of action alleging occupational disease is plaintiff's awareness that his injury was caused by a specific 'toxin' (distinct from a chemical product)," and that the statute of limitations does not accrue until the toxin is identified. We do not see how that conclusion can be drawn from the court's language. ▮ The court stated that the plaintiff must identify "each *product* that allegedly caused the injury" and that "[i]*t is insufficient to allege that the toxins in defendants' products caused it.*" (*Bockrath v. Aldrich Chemical Co., supra,* 21 Cal.4th at p. 80, italics added.) Once the product had been identified, the plaintiff could allege that "the toxins" in the product entered his body and were "a substantial factor in bringing about, prolonging, or aggravating [his] illness." (*Ibid.*) As we read the opinion, the Supreme Court was referring to "toxins" in a general sense. It was not expressing a requirement that the plaintiff identify specific chemical compounds before he or she can assert a claim. Moreover, even if

a toxic tort complaint is not complete until a particular chemical compound is identified, the statute of limitations does not await the plaintiff's discovery of every specific fact he needs to allege a cognizable claim. It accrues as soon as the plaintiff suffers an injury and "suspects or should suspect that [his or] her injury was caused by wrongdoing" or " ' " 'has notice or information of circumstances to put a reasonable person *on inquiry* . . . .' " ' " (*Jolly v. Eli Lilly & Co., supra*, 44 Cal.3d at pp. 1110-1111.) He or she "must go find the facts" and "cannot wait for the facts to find [him or] her." (*Id.* at p. 1111.) Once appellants knew or reasonably should have known that the solvent was the likely potential source of their respective injuries, they had the responsibility to investigate and determine whether to pursue legal action. Appellants had ample opportunity to discover the necessary facts. Unfortunately, they delayed until the statute of limitations had run.

### DISPOSITION

The judgments are affirmed.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied May 28, 2002, and the petition of appellant Hector Rivas for review by the Supreme Court was denied August 14, 2002.