Filed 10/8/15  Treatt USA v. Super. Court CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TREATT USA, INC., | B263117 |
| Petitioner, | |
| v. | (Los Angeles County Super. Ct. No. BC486916) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| HECTOR ANTONIO LINARES et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Maureen Duffy-Lewis, Judge. Petition granted.

Poole & Shaffery, John H. Shaffery, Jaion Chung and Mark A. Johnson for Petitioner.

No appearance for Respondent.

Metzger Law Group, Raphael Metzger, Kimberly A. Miller and Kathryn Saldana for Real Parties in Interest.

Defendant Treatt USA, Inc. (Treatt) filed a petition for a writ of mandate challenging the trial court's order denying Treatt's motion for summary judgment, which was brought on the grounds that plaintiffs' toxic tort action is time-barred under Code of Civil Procedure section 340.8.[1] We agree the action is barred and therefore and grant the petition.

## FACTUAL AND PROCEDURAL HISTORY

On June 20, 2012, plaintiffs and real parties in interest Hector Antonio Linares and Martha Gladys Linares (collectively, Linares) initiated this personal injury action against manufacturers and suppliers of toxic food flavoring chemicals. Treatt was subsequently added to the operative second amended complaint in place of a Doe defendant. Linares alleges he sustained a chronic and disabling lung disease (Bronchiolitis Obliterans) as a result of occupational exposure to toxicologically significant levels of the chemicals diacetyl and acetyl propionyl (diacetyl substitute) used to flavor artificial butter during the course of his 26-year employment for Kerry Ingredients & Flavours, and its predecessors and successor in interest (Kerry).[2]

Kerry manufactures and sells liquid and powder food flavoring products. Treatt manufacturers, distributes or supplies food flavorings. From 1986 until 2007, Linares worked at Kerry's facilities in the City of Commerce in the production department, first as a "compounder," mixing various chemicals used to

---

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure.

[2] The complaint contains claims for negligence, premises liability, strict liability, fraudulent concealment and loss of consortium. A demurrer to a claim for breach of implied warranties was sustained without leave to amend.

2

create liquid and powder flavorings, and sometime between 1993 and 1996, as a production supervisor. While in the production area, Linares' tasks included mixing, preparing and packaging food flavorings using liquid and powder products at least some of which, presumably were supplied by Treatt. In 2007, Linares was transferred out of production into a general supervisory position to avoid exposure to the chemicals. Except for a brief return to his prior position as a production supervisor from July or August through November 2011, Linares remained in that general supervisory position until his employment was terminated in January 2012.

Linares is a native Spanish speaker, and Spanish is the primary language he uses to speak, write and read. Linares, who has the equivalent of an eighth grade education, claims he is "able to speak and read very little English." Linares has a history of allergies that pre-dated his employment with Kerry. Those allergies caused Linares to suffer symptoms such as sneezing, watery eyes, runny nose and throat irritation about once a year. Linares has never been a smoker.

*Treatt's Summary Judgment Motion*

On June 12, 2014, Treatt moved for summary judgment, contending that the two-year statute of limitations under section 340.8, subdivision (a) expired before plaintiffs filed suit. Section 340.8, subdivision (a) provides: "In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever

occurs later."[3]  Treatt argued that no later than April 2009, Linares knew or had reason to know he had sustained a serious lung injury or disease caused, at least in part, by his occupational exposure to diacetyl, and had sufficient facts to put him on inquiry notice his lung injury had potentially been caused by the wrongful act of another.  Treatt's motion was supported by the following evidence.

a.    *Linares' Initial Medical Screening for Work-Related Lung Disease*

In 2005, Kerry retained the Occupational Lung Disease Clinic of National Jewish Medical and Research Center (National Jewish) to perform work-site medical screening of employees at Kerry's facility in the City of Commerce for "work-related lung disease."  Linares first underwent a medical screening by National Jewish in mid-December 2005.  In January 2006, Dr. Cecile Rose, Medical Director of National Jewish's Occupational Lung Disease Clinic, wrote a letter to Linares (the first of four she sent to Linares' home address in Palmdale) regarding the results of that screening.[4]  Dr. Rose explained that the purpose of National Jewish's spirometry (breathing) test was "to screen people for work-related lung disease," and told Linares that his test results "indicate[d] a decreased volume of air in [his] lungs (decreased FVC [Forced Vital Capacity]," which

---

[3]    It is undisputed that section 340.8, subdivision (a) governs Linares' claims against Treatt.  (*Nelson v. Indevus Pharmaceuticals, Inc*. (2006) 142 Cal.App.4th 1202, 1209; *Rosas v. BASF Corp*. (2015) 236 Cal.App.4th 1378, 1390 (*Rosas*).)

[4]    At the hearing on Treatt's motion, its counsel represented to the trial court that the letters from National Jewish had been sent in both English and Spanish translations.  Although there is an indication in Linares' deposition transcript that this was true for at least some of Dr. Rose's letters, no Spanish version of any letter to Linares from National Jewish was produced in support of the summary judgment motion.  Linares did not recall receiving either Spanish or English versions of the documents.

4

could be "due to scarring in [his] lungs, or some other lung . . . condition [and] a decrease in airflow out of [his] lungs (decreased FEV1 [Forced Expiratory Volume].)." Dr. Rose recommended that Linares share the test results with his personal physician and stated that, if National Jewish's finding was new to him, Linares "may need additional lung function testing, including full pulmonary function testing." Dr. Rose told Linares he might also need to consider "other diagnostic tests (such as lung high resolution CT scan)."

National Jewish returned to Kerry's facility in late May 2006 to perform follow-up tests on employees, including Linares, who had been "potentially exposed to hazardous chemicals." The primary purpose of the follow-up testing was "to assess unusual decline in lung function since [National Jewish's] previous visit in December 2005." In a June 23, 2006 letter, Dr. Rose told Linares that, compared to his previous test in December 2005, Linares' follow-up test showed "a decreased volume of air in [his] lungs (decreased FVC)," and "a decrease in airflow out of [his] lungs (decreased FEV1, and FEV1/FVC [FEV1 ratio expressed as a percentage of FVC].)" In other words, Linares' May 2006 spirometry test reflected he had suffered a "*decrease in [his] lung function*" since his first test five months earlier. (Italics added.) Dr. Rose again urged Linares to share his test results with his personal physician, noting that, if "this [was] a new finding, [Linares] may need additional lung function testing, including full pulmonary function testing." Dr. Rose also informed Linares that Kerry was "willing to refer employees *with concerning test results to a lung specialist for further evaluation,*" and requested Linares' permission to share the test results with Kerry. (Italics added.) Dr. Rose told Linares she would "try to contact [him] by phone to discuss this further."

Linares underwent spirometry testing performed by National Jewish three more times–in November 2006, and April and August 2007. Afterward, Dr. Rose sent similar follow-up letters to Linares in December 2006 and August 2007. In the final letter from National Jewish to Linares, dated August 14, 2007, Dr. Rose informed Linares that:

> *"Compared to previous tests,* your spirometry results have varied over time and *there has been a decline in your lung function since 11/19/06.* [¶] *We understand that you are having further medical evaluation at UCLA. Due to your persistent decreased lung function, we are recommending to your employer that you continue to avoid chemical exposure at work* until the physicians at UCLA have completed their medical evaluation. Until further evaluation of your lung function is available, we are unable to medically clear you to wear a respirator at work. [¶] We also recommend that you share this information with your personal physician. [Dr. Rose] would be happy to discuss these test results with you or your personal physician if you have any questions." (Italics added.)

By August 2007, Kerry had transferred Linares out of the production department into a general supervisory position. Linares knew Kerry removed him from his job in production as a "precaution" in order to avoid further exposure to production chemicals. In January 2007, Linares underwent a CT scan, and a follow-up CT scan was scheduled for mid-August 2007.

b. *Linares is Referred to Pulmonologists for Further Testing and Treatment*

In August 2007, Kerry sent Linares to UCLA for further medical evaluation by pulmonary specialists. From August 6, 2007 through April 29, 2009, Linares was evaluated and treated for lung injury by pulmonary specialists at UCLA,

6

primarily Dr. Alex Balekian.[5] At his deposition, Dr. Balekian testified that Linares had been removed from Kerry's production floor before their first meeting. At that meeting, Dr. Balekian explained to Linares that it was "know[n] that in rare circumstances certain lung diseases have been associated with individuals working with diacetyl, and [Linares had] this pattern of lung disease, and [Dr. Balekian could not] be certain that going back to work with diacetyl [wouldn't] make [Linares] worse." Dr. Balekian believed that, by the time of their first meeting, Linares "knew why he was [undergoing pulmonary function tests at UCLA]," knew he had "lung disease," understood that "one of the causes [of his lung disease] might be diacetyl," and knew why his job duties had been changed. In his report after that initial exam, Dr. Balekian stated that Linares' lung function tests from the previous 18 months showed an "obstructive pattern" in lung function "in a setting of occupational exposure to diacetyl," a chemical known to be implicated in rare cases of obliterative bronchiolitis. Dr. Balekian also noted that prior testing showed that Linares' FEV1/FVC ratio had "steadily declined" over the past 18 months. Dr. Balekian also testified that, throughout the nine-month period during which he evaluated Linares, he explained repeatedly to Linares that he had an obstructive lung disease which could have been caused by exposure to diacetyl in his workplace.

Linares, who was not symptomatic, regularly told Dr. Balekian he felt "fine" and repeatedly expressed a desire to return to his "old job" in production. In response, Dr. Balekian explained that, although he could not be certain that diacetyl had caused Linares' lung injury, it was known that "in rare circumstances

---

[5] Drs. Robert Suh, Joseph Lynch, David Zisman and Seth Rivera at UCLA also evaluated Linares and/or the results of Dr. Balekian's exams.

certain lung diseases have been associated with individuals working with diacetyl," and Linares exhibited that same "pattern of lung disease." Dr. Balekian told Linares that he could not "be certain that going back to working with diacetyl [wouldn't] make him worse." As a result of multiple discussions with Linares, Dr. Balekian firmly believed that Linares understood this explanation, and understood he needed to continue "to avoid exposure to diacetyl at work" because such exposure "could worsen his lung injury." Linares consistently reported to Dr. Balekian that he was in fact avoiding exposure to chemicals at work, and had had "absolutely zero exposure to diacetyl."

In January 2009, Dr. Balekian reported that, although Linares had "been away from any exposure to diacetyl for at least the last year," testing performed between July 2008 and January 2009 demonstrated "a slight decrease in his pulmonary function." Prior to January 2009, Linares told Dr. Balekian that he had not experienced shortness of breath or other symptoms of lung disease, had not restricted his physical activities in any way and was able to run and play field soccer with his children for 20 minutes without limitations. During an examination on January 29, 2009, however, Linares told Dr. Balekian that he had recently begun to experience "some slight chest tightness with breathing and increased cough." Dr. Balekian prescribed medication (QVAR, inhaled twice daily) "to treat any possible underlying component of occupational asthma."

At the time of Dr. Balekian's final consultation with Linares on April 29, 2009, Linares was still using QVAR. He told Dr. Balekian that, although he still felt no symptoms, he had recently begun to suffer dyspnea (a sudden or severe shortness of breath or labored breathing) and had to stop after running around with his children for five minutes. Although Linares had recovered quickly and been able to resume strenuous activities, he still needed to stop every five minutes. Dr.

8

Balekian refilled Linares' prescription for QVAR and wrote him an additional prescription for albuterol to take in case of emergency, and before engaging in physical exertion. Dr. Balekian again advised Linares "to avoid the mixing areas of [Kerry's] factories, and to wear an N-95 mask if he [had] to be in the vicinity for any reason."

*Linares' Opposition*

In opposition to Treatt's motion, Linares argued that triable issues existed whether he was aware he had suffered a lung injury before November 2010, was aware of the cause of that injury before he stopped working in 2012, or was aware of facts creating a reason to suspect wrongdoing before 2012.[6] He produced the following evidence, primarily from Linares' deposition.

Through an interpreter, Linares testified that he recalls receiving "breathing" tests at work, but he "does not recall" speaking with any doctor, any National Jewish representative, anyone at Kerry or his own physician about the results of those tests. He "does not recall" receiving any correspondence from National Jewish, and did not understand that the tests National Jewish performed indicated he was experiencing declining lung function. Linares stated that he speaks and reads "very little" English. He did not recall any interpreter being present either when he spoke with any representative from National Jewish, or during his meetings with doctors at UCLA, with whom he communicated in English. Linares testified that he tried to understand the doctors at UCLA "as much as [he] could,"

---

[6]    Linares objected to portions of Treatt's evidence. The trial court overruled all objections, and Linares does not challenge that ruling on appeal.

9

and tried to speak to Dr. Balekian "with the little [English] that [he] speak[s] and . . . understand[s]."

Linares understood that Kerry removed him from its production area in 2007 as a precaution against exposure to production chemicals, and knew that "a lot of chemicals" were used in production. He does not recall being told to avoid any particular chemical, or specifically to avoid diacetyl. After being removed from the production department, Linares "tried to minimize his contact with the chemicals" Kerry used in production. Despite his efforts, Linares said he was never completely removed from exposure to chemicals.

Linares also understood that Kerry had sent him to UCLA for evaluation in 2007 as a "precaution." However, he had "no idea" what the precaution was or whether it was because he had worked with diacetyl. Linares "does not recall" Dr. Balekian ever telling him to avoid diacetyl at work, or that he had a lung disease or permanent impairment.

Linares had allergies before he began working at Kerry in 1986. The allergies caused him to suffer symptoms such as sneezing, and watery red eyes about once a year. From 1986 until November 2010, Linares experienced no symptoms of respiratory health problems or lung disease or impairment (e.g., short/labored breath at rest or after physical exertion, chest pain or cough).

In July 2011, Kerry told Linares he could return to his prior job as a production supervisor, so long as he avoided diacetyl.[7] Linares resumed his previous position as production supervisor in August or September 2011. He

---

[7]    In July 2011, Kerry changed its practice and began processing and/or using diacetyl only in a segregated areas of its facilities. Linares did not remember ever being in the area where diacetyl was handled after July 2011.

supervised production workers who prepared liquid and powder products, and sometimes made products himself.

Linares felt well until November 2010, when he began feeling fatigue, shortness of breath and an increase in his allergy symptoms. Linares told his (new) doctors at UCLA about this change. He does not recall being prescribed any medication or undergoing any special treatment. He does not recall the doctors saying anything about his changed symptoms or being diagnosed with any particular lung condition or disease.

After Linares said he felt "more tired" after returning to the production department, his doctor recommended that Linares again be removed entirely from Kerry's mixing and packaging areas. By the end of November 2011, Linares had been reinstated in his general supervisorial position and was limited to working in a separate, well-ventilated office away from production. In January 2012, Linares' employment was terminated. Although Linares remained able to perform his job duties, his supervisors told him they wanted his lungs to get better and that he was being sent home to rest.

At no point during his employment with Kerry from 1986 to January 2102 did Linares either believe or suspect that anyone had done anything wrong to cause him lung injury. The first time Linares believed diacetyl was dangerous and had caused him injury was after he was laid off in 2012, when a doctor told him "he needed to get professional help for compensation for his injury." Linares never recalls any doctor identifying his lung condition by name, or telling him that the condition was permanent and irreversible. Linares still does not clearly understand the nature of his lung condition.

*The Trial Court's Ruling*

Following oral argument on Treatt's motion, the court took the matter under submission and stated that it would issue its ruling by minute order. On March 3, 2015, the trial court issued a minute order overruling all evidentiary objections and denying summary judgment on the ground that Linares lack of recollection and difficulty understanding English created a triable issue of fact whether he (or a reasonable person in his position) understood the information about his condition that was conveyed to him. In the minute order, the court directed Treatt's counsel to "give notice."

On April 3, 2015, Treatt filed the instant petition seeking a peremptory writ of mandate directing the trial court to vacate its order denying summary judgment, and enter a new order granting the motion. We issued an alternative writ directing the trial court to grant the relief requested by petitioners or to show cause why it should not be ordered to do so. The trial court declined to take any action, and Linares filed a return to the alternative writ, to which Treatt filed a reply.

## DISCUSSION

1. *The Petition was Timely*

In his return to the alternative writ, Linares contends Treatt's petition was not timely filed and that, as a result, we lack jurisdiction to consider it. We disagree.

Section 437c provides that, upon entry of an order denying summary judgment, "a party may, within 20 days after service upon him or her of a written *notice of entry of the order,*" petition an appropriate reviewing court for a peremptory writ. The filing period is extended five days where notice is served by mail within California. Prior to expiration of this period the trial court may, for

12

good cause, permit a single extension of time for up to 10 days. (§ 437c, subd. (m)(1), italics added.)

Where, as here, the Legislature prescribes statutory deadlines within which a writ petition must be filed, such deadlines are mandatory and jurisdictional. (See *In re Antilia* (2009) 176 Cal.App.4th 622, 630 ["A time limit prescribed by the Legislature for filing a petition for writ of mandate is jurisdictional"]; *Bensimon v. Superior Court* (2003) 113 Cal.App.4th 1257, 1259 ["failure to file the writ petition even by a single day is fatal"]; cf. *Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561, 573, fn. 17 [acknowledging that requirements of section 437c, subd. (m)(1) are jurisdictional, but nevertheless addressing untimely petition raising questions "inextricably intertwined with an issue already before" the court in a pending petition].)

In the instant case, the minute order was entered by the clerk on March 3, 2015, and, according to the signed "Clerk's Certificate of Mailing," served that same day by mail on Treatt's counsel, located in Los Angeles. The minute order is neither signed by the trial court nor file-stamped.[8] Treatt's attorneys received the minute order on March 9, 2015. There is no evidence in the record that Treatt's counsel complied with the court's order to provide notice of the court's ruling, or requested an extension of the filing deadline for a writ petition from the trial court.

Linares argues that the 25-day period for filing a writ petition was triggered by the clerk's mailing of the minute order. Accordingly, he asserts that the petition

---

[8] The bottom of each page of the minute order bears this notation: "MINUTES ENTERED 03/03/15 COUNTY CLERK." Such a notation is not a file stamp. (*Alan v. American Honda Motor Co., Inc* (2007) 40 Cal.4th 894, 902 (*Alan*); *In re Marriage of Taschen* (2005) 134 Cal.App.4th 681, 686.)

13

was due no later than March 30, 2015 (taking the weekend into account), but was filed at least three days too late.  Treatt insists the petition was timely because it did not learn of the court's ruling until its counsel received the order on March 9, 2015, and within 25 days thereafter filed its petition.  We agree with Treatt.

Some courts have found that a clerk's mailing of a trial court ruling in the form of a minute order is sufficient to constitute notice of entry of the order commencing the running of the time period within which to seek writ review under section 437, subdivision (m)(1).  (See e.g., *Sturm, Ruger & Co. v. Superior Court* (1985) 164 Cal.App.3d 579, 582 [under identical language of former § 437c, subd. (l)]; *Schmidt v. Superior Court* (1989) 207 Cal.App.3d 56, 60 [same]; see also *MinCal Consumer Law Group v. Carlsbad Police Dept.* (2013) 214 Cal.App.4th 259, 266 [writ review under Gov. Code, § 6259, subd. (c) of denial of inspection request under California Public Records Act].)  However, such a conclusion is at odds with the express statutory requirement for service of a written "notice of entry" in order to trigger the deadline to seek writ review.  It is also at odds with numerous cases involving the same jurisdictional issue in analogous contexts in which courts have emphasized the need for strict enforcement of technical notice requirements for triggering jurisdictional deadlines.

In *Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, the California Supreme Court held that, to trigger the 60-day jurisdictional deadline for ruling on a motion for new trial, the clerk's certificate of mailing must contain specific language affirmatively stating "it was given 'upon order by the court' or 'under section 664.5.'"  (*Id.* at p. 64.)  The Court reasoned that no one "should be required to speculate about jurisdictional time limits."  (*Ibid.*)  Because the clerk failed to include such language in the notice sent to the parties, the jurisdictional deadline to rule on the

14

motion was not triggered.  (*Id.* at pp. 57-58, 65.)  Courts have reached the same result in cases involving the strict jurisdictional time limit for filing a notice of appeal.  (See e.g., *Bi-Coastal Payroll Services, Inc. v. California Ins. Guarantee Assn.* (2009) 174 Cal.App.4th 579, 586 [clerk's mailing of minute order that was neither file-stamped nor specifically entitled "notice of entry" did not commence 60–day appeal deadline even though clerk's certificate of mailing described minute order as "notice of entry"]; *Sunset Millennium Associates, LLC v. Le Songe, LLC* (2006) 138 Cal.App.4th 256, 259-260 ["notice of entry" language buried on the 13th page of a 14-page minute order was insufficient to trigger the deadline for filing notice of appeal]; *Hughey v. City of Hayward* (1994) 24 Cal.App.4th 206, 210 [clerk's mailing of minute order did not commence the 60–day appeal period because the document was not entitled "notice of entry" and was not file-stamped].)

This Court too has long emphasized the need for strict enforcement of technical notice requirements to trigger the appeal deadline.  In *20th Century Ins. Co. v. Superior Court* (1994) 28 Cal.App.4th 666 (*20th Century Ins.*), concerning an appeal to the appellate division of the superior court, we found a "notice of ruling" insufficient to constitute the requisite "notice of entry" of the judgment.  (*Id.* at pp. 671–672.)  We observed that it "might seem that the difference between a 'notice of ruling' and a 'notice of entry' is hypertechnical.  In another context it might be."  (*Id.* at p. 672.)  However, because "the time within which an appeal must be filed is jurisdictional, rules that measure that time must stand by themselves without embroidery."  (*Ibid.*; see also *Cuenllas v. VRL International, Ltd.* (2001) 92 Cal.App.4th 1050 [service of a minute order noting date order was entered, but not entitled "notice of entry" did not trigger 60-day period for filing notice of appeal].)  In *Alan, supra,* 40 Cal.4th 894, the California Supreme Court

15

agreed. Citing *20th Century Ins*., among other cases, *Alan* held that a single, self-sufficient document (either a document entitled "Notice of Entry" or a file-stamped copy of judgment/order) is necessary to trigger 60-day appeal deadline. (*Id*. at pp. 902-903, 905.)

Under the reasoning of *Alan* and like cases (which we find persuasive), the clerk's mailing of the minute order denying summary judgment constituted insufficient notice to trigger the filing deadline for Treatt's petition. The document does not specifically state that it is a "*notice of entry* of the order." (§ 437c, subd. (m)(1), italics added.) Indeed, it directed Treatt to give notice of the ruling, thus indicating that it was not intended to be notice of entry of the order. Further, it is not a file-stamped copy of the order (see *Alan, supra,* 40 Cal.4th at pp. 902-903, 905), or formal notice of the court's ruling served by counsel. Thus, the mailing of the order did not trigger the start of the deadline to file a writ petition. We conclude that the period for filing a writ petition under section 437c, subdivision (m)(1) began on the date Treatt received the minute order, March 9, 2015. Within 25 days of this date, Treatt timely filed its writ petition. We therefore turn to the merits.

2. *Summary Judgment*

   a. *The Standard of Review*

An order denying summary judgment is reviewable by a petition for writ of mandate. (§ 437c, subd. (m)(1); *NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1230.) We independently review the order, applying the same standard as the trial court. (*Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048, 1054 (*Clark*); *Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1620 (*Miller*).)

16

A defendant moving for summary judgment based on an affirmative defense bears the initial burden of producing evidence to establish a prima facie showing of the nonexistence of any triable issue of material fact as to each element of the affirmative defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*); *Rosas, supra,* 236 Cal.App.4th at p. 1388; § 437c, subds. (o)(2), (p)(2).) If the defendant satisfies this burden, the plaintiff must produce evidence showing the existence of a triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at p. 850; § 437c, subd. (p)(2).) We view the evidence in a light favorable to the plaintiff, liberally construing its evidentiary submission, strictly scrutinizing the defendant's showing and resolving evidentiary doubts or ambiguities in plaintiff's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

Ordinarily, resolution of the statute of limitations issue is a question of fact. However, if the uncontradicted facts lend themselves to a single legitimate inference, summary judgment is proper. (§ 437c, subd. (c); *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 (*Jolly*); *Clark, supra,* 83 Cal.App.4th at pp. 1054–1055 [under section 340.8, summary judgment is appropriate if only one legitimate inference—that plaintiff was aware of sufficient information to put a reasonable layperson on notice that his injury was caused, in whole or part, by another's wrongdoing—may be drawn from uncontradicted facts].)

b. *The Statute of Limitations*

Section 340.8, subdivision (a) provides: "In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and

17

(3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." The statute thus codifies the "'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Fox v. Ethicon Endo–Surgery, Inc*. (2005) 35 Cal.4th 797, 807 (*Fox*).)

Under the discovery rule, it is not necessary that a plaintiff be aware of "the specific causal mechanism by which he or she has been injured." (*Knowles v. Superior Court* (2006) 118 Cal.App.4th 1290, 1298 (*Knowles*); *Jolly, supra*, 44 Cal.3d at pp. 1110–1111; *Rivas v. Safety-Kleen Corp*. (2002) 98 Cal.App.4th 218, 229 (*Rivas*).) A plaintiff is deemed to have discovered the "cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation]." (*Norgart v. Upjohn Co*. (1999) 21 Cal.4th 383, 397 (*Norgart*).) "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, []he must decide whether to file suit or sit on [his] rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; []he cannot wait for the facts to find [him]." (*Jolly, supra*, 44 Cal.3d at pp. 1110–1111.)

The test is objective. The plaintiff is held both to his actual knowledge and knowledge he could have discovered by investigating available sources. (*Jolly, supra,* 44 Cal.3d at p. 1109; *McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 108 ["Subjective suspicion is not required. If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have

18

been revealed by such an investigation. [Citations.]"].) [9] The determination whether "wrongdoing" has occurred is made according to a layperson's understanding. (*Jolly, supra*, 44 Cal.3d at p. 1110, fn. 7; *Norgart, supra,* 21 Cal.4th at pp. 397–398.) In the context of a products liability action such as this, the statute of limitations begins to run when the plaintiff suspects or has reason to suspect that a product caused his injury. (*Fox, supra,* 35 Cal.4th at p. 813; *Jolly, supra,* 44 Cal.3d at pp. 1110–1111.)

c.      *Treatt met its Burden to Establish that Linares' Claims Accrued at Least Two Years Before this Action was Filed*

We conclude Treatt is entitled to summary judgment because the only legitimate inference that may be drawn from this record is that no later than April 2009 (when his last consultation with Dr. Balekian occurred), Linares was or reasonably should have been aware he had sustained appreciable lung injury caused, at least in part, by occupational exposure to toxins, and that a reasonable person in Linares' position would suspect or should have suspected wrongdoing. Thus, the two-year limitation period expired before the action was filed on June 20, 2012.

---

[9]      A non-employee's claim for loss of services or consortium is dependent on the viability of an employee's claims. (*Snyder v. Michael's Stores, Inc.* (1997) 16 Cal.4th 991, 998-999.) If Hector Linares' claims are time-barred, so is Martha Linares' claim for loss of consortium. (*Id*. at p. 999.)

d.      *Linares Knew or Should Have Known of his Lung Disease by April 2009*

The evidence established that, by April 2009, Linares suffered appreciable harm, because by that time he had been diagnosed with a serious and potentially irreversible lung illness.  Treatt presented uncontradicted evidence that, between December 2005 and August 2007, Linares underwent a series of tests performed by representatives from National Jewish's Occupational Lung Disease clinic at his workplace.  The sole purpose of those tests was to screen Kerry employees for "work-related lung disease."  Over the course of 18 months, those tests revealed that Linares was experiencing persistently decreasing lung function.  The results of Linares' tests were sufficiently troubling to cause his employer in 2007 to remove Linares entirely from the production department and from exposure to chemicals used there, including diacetyl.  Linares understood that Kerry changed his job duties in 2007 as a "precaution" in order to avoid his further exposure to production chemicals.  Linares also understood that the results of tests performed by National Jewish raised sufficient concerns to cause his employer to send Linares to pulmonary specialists at UCLA for additional evaluations.

Between August 2007 and April 2009, Linares was evaluated by Dr. Balekian and other pulmonologists at UCLA at least five times. Treatt presented evidence that, from the outset and throughout that period, Dr. Balekian clearly explained to Linares that he had lung disease.  Although Dr. Balekian could not specifically identify the etiology of the disease, he told Linares that exposure to diacetyl was known to have caused lung disease in rare cases, and that the pattern of Linares' disease was consistent with patterns displayed by individuals who contracted lung illnesses due to exposure to diacetyl.  Accordingly, Dr. Balekian instructed Linares to continue to avoid the flavoring mixing areas at Kerry and any

20

contact with diacetyl because additional exposure could make his condition worse. Although Linares repeatedly expressed a desire to return to his "old job" in production, Dr. Balekian explained why that would be too risky for him. Dr. Balekian had no doubt that Linares understood the doctor's explanations, and understood that he needed to stay away from diacetyl to avoid further lung damage. Linares repeatedly assured Dr. Balekian he had continued to avoid the chemical.

In January 2009, Dr. Balekian reported that, even though Linares had not been exposed to diacetyl for at least a year, his test results were still revealing a slight "decrease in his pulmonary function." Linares had experienced no symptoms of lung disease before January 2009. Until then, he had not restricted his physical activities and was able to run and play soccer with his children for 20 minutes. By mid-January 2009, however, Linares began experiencing "slight chest tightness with breathing and increased cough." As a result, Dr. Balekian prescribed medication for Linares (QVAR, inhaled twice daily), to "treat any possible underlying component of occupational asthma." Linares used the QVAR for several months. At his final examination by Dr. Balekian in April 2009, Linares told the physician that, although he still felt no symptoms, it was now necessary for him to stop every five minutes when running around with his children. Dr. Balekian refilled the QVAR prescription and gave Linares an additional prescription for albuterol to be used in case of emergencies and as a prophylactic measure before engaging in physical exertion. Based on this evidence Treatt established that, no later than April 2009, Linares knew or reasonably should have known he had sustained appreciable harm. (See *Davies v. Krasna* (1975) 14 Cal.3d 502, 514 [claim accrues upon "infliction of appreciable and actual harm, however uncertain in amount"].)

Our decision in *Rivas, supra,* 98 Cal.App.4th 218 is instructive.  In *Rivas*, the plaintiff worked in an auto salvage yard from 1973-1991.  In 1991, he was diagnosed with kidney failure and told by his doctor to avoid contact with a particular solvent he used at work.  Plaintiff was referred to specialists who diagnosed him with renal failure, "etiology undetermined."  (*Id*. at p. 223.)  He had a kidney transplant in 1995.  In 1996, plaintiff filed a workers' compensation claim seeking recovery for injury to his kidneys resulting from occupational exposure to toxic fumes, gases and liquids.  (*Id*. at p. 226.)  In 1998, plaintiff filed a personal injury action against the manufacturer of the solvent, claiming he suffered severe kidney damage as a result of occupational exposure to toxic chemicals.  (*Ibid*.) Plaintiff argued that the action was not barred by the (then one-year) statute of limitations because, under the discovery rule, the limitations period did not begin to run "until the injured party [was] *explicitly informed* by his doctors *that a certain substance or product caused the medical disorder* or has had an opportunity to personally review medical records specifying the cause of the disorder."  (*Id*. at p. 228, italics added.)  We rejected this contention and found that plaintiff had sufficient knowledge of both injury and wrongdoing for purposes of accrual of the statute of limitations more than one year before filing his complaint: "Rivas was *informed by his physicians in 1991 that he was suffering from a serious and debilitating condition.  He was asked to provide a list of all the chemicals he came in contact with and *told in no uncertain terms to keep away from the solvent he was using at work.  This alone should have been sufficient to arouse a reasonable person's suspicion and lead to further investigation*."  (*Id*. at pp. 228,

italics added.)[10] The facts in the underlying litigation dictate the same result. Linares knew he had an appreciable lung injury no later than April 2009.

e.   *Treatt Demonstrated that Linares Suspected or Had Reason to Suspect the Physical Cause of his Lung Injury no Later than April 2009*

The evidence is also not reasonably subject to dispute that, no later than April 2009, Linares knew or reasonably should have known he had an appreciable lung injury likely resulting from exposure to diacetyl at work.

*Miller, supra*, 1 Cal.App.4th 1611 is illustrative. In early 1983, Miller moved to a condominium in a complex that had experienced flooding since 1981. In October 1983, after experiencing allergies and asthma, Miller was diagnosed with an allergy to mold, and other substances. (*Id*. at p. 1616.) In summer 1984, Miller was hospitalized after experiencing severe bouts of asthma. In October 1984, Miller had her unit (which smelled musty) tested for mold contamination, retained a microbiologist to pinpoint the source, and had her husband send a letter to the defendant homeowner's association stating that the flooding caused mold which in turn had caused Miller to experience severe allergic reactions the year before. Miller's doctor advised her to move. (*Id*. at p. 1617.) In January 1986, after suffering a number of illnesses, Miller was diagnosed with a fungal infection. In December 1986, Miller was diagnosed with immune disregulation caused by exposure to mold. (*Id*. at p. 1618.)

---

**10**    We also found that plaintiff's filing of a workers' compensation claim in 1996 based on exposure to toxic chemicals constituted further "definitive proof that he had a suspicion that 'someone ha[d] done something wrong to [him]' long before [he filed] his civil complaint." (*Rivas, supra*, 98 Cal.App.4th at p. 229.)

Miller filed suit in August 1986. The court found the action untimely. It found that Miller had unreasonably delayed in bringing her claim, even though she had not definitively learned that mold had caused her illness until after the limitations period expired. The court held that "reasonable minds can draw only one conclusion"—that Miller's claim accrued in October 1984 when she suffered appreciable and actual harm (allergies and asthma) and became aware of its cause (the mold). (*Miller, supra*, 1 Cal.App.4th at p. 1624.) For purposes of determining the accrual of the statute of limitations, it was irrelevant that other factors may have contributed to Miller's injuries aside from the defendant's negligence. (*Ibid*.) The fact that the specific injury for which Miller sued was not diagnosed until 1986 did not entitle her to delayed accrual. That diagnosis, or lack thereof, had not affected Miller's ability to recognize that defendant's conduct had caused her harm. (*Id*. at pp. 1624-1625.)

Similarly here, by mid-August 2007, National Jewish advised Linares that he had suffered a persistent decrease in lung function over the past few months, and urged him to avoid occupational exposure to chemicals. By then, Linares' employer had already moved him away from production chemicals and into an administrative position in a separate, well-ventilated office. Linares understood that job change was effected as a "precaution" to avoid his further exposure to production chemicals. Also in August 2007, Linares' employer sent him to pulmonary specialists at UCLA for extensive evaluations of his lung condition. Beginning with his first consultation with the pulmonologists at UCLA in August 2007, and during every appointment thereafter, Linares was advised he had lung disease and that, although the pulmonologists could not be certain that exposure to diacetyl caused Linares' illness, he strongly suspected the chemical as a potential cause. Accordingly, Dr. Balekian insisted that Linares avoid further exposure to

24

diacetyl because of the potentially dangerous causal link between his lung injury and occupational exposure to diacetyl.

Thus, Treatt established that no later than April 2009, Linares suspected, or reasonably should have suspected, that he had suffered lung injury potentially caused by his occupational exposure to diacetyl. (See *Fox, supra*, 34 Cal.4th at p. 813 [in toxic tort action, statute of limitations begins to run once plaintiff suspects or has reason to suspect product has caused his injury, without regard to whether plaintiff knows specific causal mechanism]; *Rivas, supra*, 98 Cal.App.4th at p. 229.)

f. *By April 2009, Linares Suspected or Had Reason to Suspect his Lung Disease was Caused by Wrongful Conduct*

Treatt's evidence demonstrated that Linares was aware of sufficient facts to put a reasonable person on inquiry notice that his injury was caused in whole or in part by a wrongful act as early as August 2007 and no later than April 2009. By August 2007, after a series of screening tests revealed a persistent decline in Linares' lung function, Kerry had completely removed Linares from the production and mixing area and transferred him to a new position to ensure he avoided exposure to diacetyl and other flavoring chemicals. By the end of April 2009, Linares had repeatedly been advised by Dr. Balekian of the potential causal link between his occupational exposure to food flavoring chemicals, including diacetyl, and his lung illness and of the compelling need for him to avoid further exposure to that chemical. According to Dr. Balekian, Linares understood and repeatedly assured him that he had done what he could to avoid or minimize his exposure to diacetyl at work, and that he continued to do so.

On these facts, a reasonable person in Linares' position would suspect, no later than April 2009, that his occupational exposure to diacetyl and/or other food flavoring chemicals was a likely cause of his injury.  A reasonable person would also suspect that this occurred because someone did something "wrong," as that word is ordinarily understood (e.g., defective product, negligent failure to warn of risks posed by exposure to or the danger of improper handling of diacetyl, or failure to ensure use of appropriate safety gear).  (Cf. *Rosas, supra*, 236 Cal.App.4th at pp. 1395-1396, 1398 [triable issue existed whether plaintiff was on inquiry notice that workplace exposure to diacetyl caused his lung disease, where plaintiff was subjectively suspicious that working with powdered chemicals (diacetyl is a liquid) caused his condition, but physicians he consulted did not ask about or suggest that exposure to toxins caused his injury].)  Thus, Treatt established there was no triable issue as to the third (someone's wrongdoing) element of the section 340.8 analysis.

3.      *Linares did not Satisfy his Burden to Establish the existence of a Triable Issue of Fact*

        a.      *Linares did not Establish that a Language Barrier Prevented him from Understanding the Information he Received from Drs. Rose or Balekian*

Linares contends that Treatt's showing is insufficient to compel summary judgment, because it did not demonstrate that:  (1) he received, read or understood the letters from Dr. Rose, (2) he read or understood the medical reports containing observations by Dr. Balekian or the UCLA doctors (which are not addressed to him), or (3) he understood what Dr. Balekian said to him during their meetings.

26

Linares' contentions hinge on his claim that he has little formal education, and that, because Spanish is his primary language, he has limited ability to speak, read or understand English. He insists that, in the context of a summary judgment motion, the court cannot infer that he received or understood "the highly technical, medical terminology" used by National Jewish and Dr. Balekian in the English-language letters and records submitted in support of Treatt's motion. For the reasons that follow, construing Linares' showing in the light most favorable to him, we are not persuaded that he raised a triable issue of fact.

First, Linares' contention that that Treatt cannot establish he received any follow-up letter Dr. Rose sent following the tests performed by National Jewish is contradicted by his own deposition testimony, in which acknowledged that he "received" and "saw many documents like" the letters from Dr. Rose at his home. Linares also acknowledged that Dr. Rose's letters were addressed to him at his home in Paramount, and that his address remained the same from 2006 and mid-August 2007. Linares admitted that he received regular mail at his home address and that he received letters from National Jewish there.

On this record, there is no triable issue whether Linares received Dr. Rose's letters and reasonably should have been aware of their contents. In California, it is presumed that a "letter correctly addressed and properly mailed [has] been received in the ordinary course of mail." (Evid. Code, § 641.) That Linares may have chosen not to read (or to have read to him) any letter sent by National Jewish regarding the results of his lung screening tests, is irrelevant. Linares' purposeful ignorance and subjective lack of awareness is not dispositive. The standard is objective one, and a reasonable person in Linares' shoes would not have ignored the letters from Dr. Rose.

27

Second, a careful review of the record reveals that Linares also does not claim he never communicated with Dr. Rose or representatives of National Jewish about the results of his tests, or that a language barrier prevented him from understanding what was said in those conversations. Rather, Linares testified that, although he recalls having discussions with National Jewish representatives, he "[doesn't] remember" the substance of any of those conversations. Only English was spoken during his conversations with National Jewish representatives, and Linares does not recall an interpreter being present for any conversation. However, Linares also testified that he did not remember that he "ever had a problem communicating with anybody at National Jewish." In sum, Linares does not actually claim he never received or understood the communications he received from anyone from National Jewish, only that he "does not recall" doing so. But Linares' lack of recollection does not constitute affirmative evidence raising a triable issue concerning Treatt's evidence that he did receive and understand the communications.

Third, for similar reasons, Linares' claim that a language barrier prevented him from understanding information conveyed by Dr. Balekian does not create a triable issue whether he understood the substance of those conversations. Both Dr. Balekian's reports and his deposition testimony reflect that, from Linares first visit, Dr. Balekian did not perceive any language difficulty or impediment to their communications in English. He specifically recalled what he told Linares, and that Linares understood him and assured him that he was staying away from the chemicals at work. Dr. Balekian did not believe he and Linares had difficulty communicating in English. Indeed, Dr. Balekian's reports specifically state that Linares "[spoke] to [Dr. Balekian] *in complete sentences*." (Italics added.) In response to this evidence, Linares testified only that he "[tried] to understand

28

[those discussions] as much as [he] could" with his "limited" English. However, testimony that he tried to understand as best he could is not proof that he did not understand, especially in light of specific, detailed evidence Treatt presented concerning his obvious understanding. Moreover, Linares could not recall ever requesting that an interpreter be present during any meeting with Dr. Balekian or other physicians at UCLA, and never "inform[ed] anybody at UCLA that [he] did not understand what they were telling [him]," and "[doesn't] remember" "hav[ing] any problems understanding Dr. Balekian's questions." Further, Linares conceded he had no reason to doubt the accuracy of the information in the UCLA reports. In short, Linares' noncommittal showing based on a lack of recollection and a claim to have understood as best he could falls short of affirmative evidence raising a triable issue concerning Treatt's showing that he did understand the information conveyed by Dr. Balekian.

b. *Linares did not Establish a Triable Factual Issue as to Whether he was or Should Have Been aware of a Lung Injury Likely Caused by Exposure to Diacetyl before June 2010*

Treatt presented evidence that Linares received a diagnosis of lung injury well before June 2012. Linares claims he "does not recall" receiving a diagnosis by then. But he offered no evidence to support his claim. Rather, he simply disputes the inference that he received this information from National Jewish or the doctors at UCLA or that he understood what he was told. As we have discussed, there is no triable issue of fact on these matters. Moreover, even if Linares did not receive a specific diagnosis until 2012, that fact is irrelevant. The record contains sufficient evidence to support a reasonable inference that Linares—or any

29

reasonable person in his position—was on notice well before 2010 that he had a serious lung condition.

Between late 2005 and summer 2007, National Jewish visited Kerry's worksite to test its employees for "*work-related* lung disease." (Italics added.) Linares participated in those tests. From the outset, Linares' tests revealed trouble: he had a "decreased volume of air in [his] lungs [and] a decrease in airflow out of [his] lungs." Dr. Rose urged Linares to share the test results with his own doctor and said that, if National Jewish's test results had revealed a condition previously unknown to him, Linares might need "additional lung function testing." National Jewish performed four successive tests on Linares over the course of the next 15 months. The purpose of each test performed by National Jewish was identical. By the time its testing was complete in August 2007, National Jewish was clearly troubled by Linares' test results. Even though his employer had already removed Linares from further exposure to diacetyl, Dr. Rose said Linares' lungs required further evaluation. Until the evaluations at UCLA were completed, Dr. Rose refused to clear Linares to wear a respirator at work, and said she would recommend to Linares' employer that he "*continue to avoid chemical exposure at work*." (Italics added.) Thus, the record reflects that, by August 2007, Linares was or reasonably should have been aware he had suffered an appreciable injury. Indeed, Linares conceded that Kerry both moved him out its production area in 2007 and into a general supervisory position as a precaution against his further exposure to chemicals, and sent him to UCLA as an additional precaution and for more extensive tests.

Later, between early August 2007 and April 2009, Linares made a number of lengthy trips to UCLA for intensive assessments of his lung condition, and knew he had been sent to the doctors at UCLA because he had been exposed to

chemicals at work. From the outset of those assessments, Dr. Balekian repeatedly explained to Linares that, even though he was not yet experiencing symptoms of lung disease, and Dr. Balekian could not be certain of its precise etiology, Linares did in fact have a disease that could have been caused by exposure to diacetyl. Although Linares repeatedly told Dr. Balekian that he felt "fine" and wanted to return to his "old job" in production, Dr. Balekian persistently explained why Linares could not do so. He told Linares that doctors now knew that, in some instances, diacetyl had caused lung disease. The pattern of Linares' lung disease was identical to patterns of other individuals who had developed lung disease after working with diacetyl. Dr. Balekian also explained that he could not "be certain that going back to working with diacetyl [wouldn't] make [Linares] worse." Every time they met Dr. Balekian questioned Linares in depth to ensure that he had had no additional exposure to diacetyl. Dr. Balekian was confident Linares understood he needed to avoid diacetyl or risk worsening his injury. Linares assured Dr. Balekian that he was avoiding the chemical, worked in a separate, well-ventilated area and had "absolutely zero exposure to diacetyl or the environment in which it [was] mixed." Thus, the evidence leaves no doubt that no later than April 2009 Linares was or reasonably should have been aware of facts showing he likely had lung damage from working with diacetyl.[11]

---

[11] In a similar vein, Linares argues he is entitled to delayed accrual because "there is no evidence [he] received a diagnosis . . . more than two years before his complaint was filed," and he showed no symptoms until November 2010. He also claims he cannot remember if Dr. Balekian or any doctor ever told him he had "reactive airways disease." Again, regardless of whether he received a specific diagnosis, the evidence conclusively demonstrates that he was, or reasonably should have been, aware that he had suffered lung disease from exposure to diacetyl at work. Further, although Linares could not recall whether Dr. Balekian or any doctor from UCLA (or elsewhere) "actually diagnosed [him] with some type of lung disease or illness as of January 2009," he has conceded he

31

c.   *Linares Failed to Raise any Triable Factual Issue*
     *Whether he was or Reasonably Should Have Been Aware that*
     *his Lung Injury was Caused by a Wrongful Act*

For the same reasons, Linares failed to show that a triable issue existed whether he reasonably should have known that his lung condition was caused by a wrongful act.  As we have explained, under the discovery rule, the limitations period begins to run once a reasonable person does or "should suspect that [his] injury was caused by wrongdoing, that someone has done something wrong to [him]," even if the plaintiff himself is subjectively oblivious.  (See *Fox, supra*, 35 Cal.4th at p. 807; *Jolly, supra*, 44 Cal.3d at p. 1110.)  That Linares may not definitively have known before November 2010 that he suffered from a specific lung disease is legally irrelevant.  Once Linares was on inquiry notice, he was charged with information he could have gained by a reasonable investigation (*Fox, supra*, 35 Cal.4th at p. 807), and the record demonstrates that, at a minimum, Linares reasonably should have suspected negligence (wrongdoing) when his employer removed him from exposure to food flavoring chemicals with which he had worked on a daily basis for many years, and sent him to lung specialists to obtain a complete medical evaluation and necessary treatment.

Thus, on the evidence presented, the only legitimate inference is that, no later than April 2009, Linares was or reasonably should have been aware that he had an appreciable injury or illness, resulting from occupational exposure to

has no reason to doubt the substance Dr. Balekian's reports (which definitely reflect that, no later than April 2009, Linares had in fact been informed he had contracted a potentially irreversible obstructive lung disease.

diacetyl, caused or contributed to by wrongful acts of another (e.g., potential manufacturing defect, or actionable failure to warn of the danger of diacetyl or negligence). (*Clark, supra*, 83 Cal.App.4th at p. 1052.) Hence, the two-year limitation period of section 340.8, subdivision (a) began to run, and Linares' suit filed in June 2012 was barred.

## DISPOSITION

Let a writ of mandate issue ordering the superior court to (1) vacate its order denying Treatt's motion for summary judgment as to Hector and Martha Linares' claims for personal injury, and (2) enter a new order granting Treatt's summary judgment motion as to those claims. Treatt is entitled to its costs in this writ proceeding.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.        MANELLA, J.

33